ODOM, J.
 

 This defendant was charged in a bill of information with the crime of receiving stolen property knowing it to have been stolen, as denounced by section 832 of the Revised Statutes. From a conviction and sentence to hard labor, he appealed.
 

 The errors complained of are embodied in eighteen bills of exception, which we take up and dispose of in the order taken.
 

 1. Bill No. 1 was reserved to the ruling of the court in refusing to instruct the jury to disregard the testimony of the witness Bacon.
 

 In this connection it is proper to state that, so far as the record discloses, the accused did not defend on the ground that he did not in fact receive and have in his possession the property alleged to have been stolen, nor did he deny that the goods which he received had been taken by stealth, at night, from the Frank Mercantile Company, by his son, Mike Natalie, and Sam Shepherd, after they had broken and entered into the storehouse of said company.
 

 1-Iis defense was that the property, although taken as above stated, was not stolen, because the owner consented to the taking.
 

 Taking as their premise that the goods were not stolen, counsel for defendant argue that the accused could not be guilty of the crime of receiving and having in his possession stolen property.
 

 The proposition that, as a matter of law, one cannot be guilty of receiving stolen property unless the property received had in fact been stolen, is too plain for argument. It needs no citation of authority to support it. It is also true that one who takes property with the consent of the owner is not guilty of larceny, if the owner’s consent to the taking is obtained without fraud or deceit practiced upon him.
 

 The goods alleged to have been received by defendant with knowledge that they had been recently stolen consisted of about 250 cartons of cigarettes and a lot of tobacco belonging to the Frank Mercantile Company, of Mansfield, which concern was in charge of H. S. Bacon as general manager. Mr. Bacon was called by the state as a witness to identify the goods and to prove that they had been stolen. He did identify them by reference to secret marks which he had placed on the packages and testified that they had been taken from the company’s warehouse in Mansfield on the night of January 13, 1931.
 

 His testimony that he identified the goods by certain secret marks which he had placed
 
 *714
 
 upon the packages led to the inquiry as to why the goods were marked.
 

 Mr. Bacon’s explanation was that he had been informed by the sheriff during the day that it was likely one of the three wholesale grocery concerns in the city of Mansfield would be burglarized that night, and that cigarettes and tobacco would likely be stolen; and that he was asked by the sheriff to assist in the setting of a trap to catch the thieves, as well as those who might later receive the stolen goods. He said he consented to the scheme, marked the goods, left them in the usual place in the warehouse, closed the doors and locked them, and went home.
 

 When these facts came out, counsel for defendant, to quote from their bill of exceptions:
 

 “Moved the court to strike out, and instruct the jury to disregard all of the testimony of the witness H. S. Bacon, which testimony is attached to this bill and made a part hereof, for the reason that the charge in this ease is receiving stolen goods knowing them to have been recently stolen, and the testimony of the complaining witness H. S. Bacon was that he had consented to the taking of the goods for the purpose of apprehending those parties who had taken the goods and those parties who were receiving stolen goods; that the goods taken were not stolen but taken with the consent of the owner.”
 

 The question presented therefore is whether as a matter of law the goods were taken with the consent of the owner. The record discloses the following facts:
 

 This defendant lives in. the parish of Beauregard. Some four or five days prior to the date on which these goods are alleged to have been stolen, defendant told Dempsey Shepherd, a boy eighteen years old, that he was going to “pull a cigarette job” at Mansfield in De Soto parish, and asked him to go along and help. Dempsey says he told defendant he would not or could not go, but that he (defendant) might get Sam Shepherd, Dempsey’s older brother, to help him.
 

 Dempsey says he told his brother Sam that defendant wanted him to help “pull the job.” Sam Shepherd says that both Joe Natalie, the defendant, and his son, Mike, asked him to join them in the theft of some cigarettes. He said, “Joe told me if I would furnish a ear and just help Mike, he would show me how to make $1,500.00 a week off of cigarettes. * * * I told him I had no car, but I could get one.”
 

 After talking with his brother Dempsey and the defendant and his son, Mike, about the “cigarette job,” Sam Shepherd went to Mr. Cain, the sheriff of Beauregard parish, and told him of the plot. The sheriff told Shepherd to join them and catch them if he could, and to keep him advised as to their actions. He agreed to pay Shepherd $150 and to furnish the ear, the payment not being contingent upon a conviction.
 

 It was agreed between Mike Natalie and Sam Shepherd to go to Mansfield on January 13th, and Mr. Cain was so advised by Shepherd.
 

 Mr. Cain went to Mansfield on that day, told the sheriff about the affair, and asked him if he would join in the setting of a trap to catch the thieves. The sheriff of De Soto assented, called the wholesale dealers into conference, the witness Bacon being one of them, and it was agreed that the dealers should mark their goods so that they could be identified, leave them in the warehouses, close and lock all doors, and further agreed that neither the officers nor the dealers would interfere with or hinder the thieves in their contemplated burglary of the buildings and larceny of the goods.
 

 
 *716
 
 , Sam Shepherd and Mike Natalie went to Mansfield during the day, viewed the premises of the Frank Mercantile Company, and that night broke into the house, took 250 cartons of cigarettes and a lot of tobacco, loaded the goods into the automobile, and carried them back to Beauregard parish, where they were deposited'with the defendant, Joe Natalie.
 

 The witness Bacon, who was general manager for the Frank Mercantile Company, and had charge of its goods, admits that he consented to and took part in the setting of the trap to catch the thieves; and that he marked his goods so that he could identify them; that h:e was informed and believed that the goods or some of them would probably be stolen; that he consented with the officials that the tiiieves should not be molested in case they came, and that, if they took the goods, they shpuld be permitted to carry them away, the main purpose of setting the trap being to catch those who might ultimately receive and dispose of them; that he agreed to take chances on losing the goods which might be stolen in the hope of apprehending a gang of criminals.
 

 On the other hand he said, and his testimony is not disputed, that he did not in any way facilitate the taking of the goods; he marked and left them in the warehouse; that he closed and locked all the doors and went home; lhat he was not informed by the officials and did not know who would come to get the goods; that he did not know Mike Natalie and Sam Shepherd, the suspected thieves, and did not directly or indirectly communicate with them; that the idea and scheme to entrap the criminals did not originate with him, but that he merely assented to the scheme when it was proposed by the officials.
 

 What Mr. Bacon did in furtherance o.f the scheme to entrap the criminals was not an inducement or temptation to them to commit the crime, nor did he facilitate the taking of the goods. He merely assented to the setting of the trap to catch them., His marking of the goods did not facilitate the taking of them. That was done to catch the criminals. -He did not in any sense induce or encourage the eommission of the crime, but only refrained from interfering with the carrying out by the parties of their previously formed criminal designs, -by staying away from the building after closing and locking it. His conduct was merely a passive assent to the taking of the goods. The criminal design and intent to take the goods originated, independently, in the minds of those who took them, and Bacon did no more than passively assent to their carrying out of their designs.
 

 Under the facts and circumstances here shown, we hold that Bacon’s participation in the transaction did not, in law, amount to a consent to the taking.
 

 Under the settled jurisprudence of this and other states, Bacon might have gone even further than he did without its being said that, as a" matter of law, he consented to the taking. In the case of State v. Duncan, 8 Rob. 562, it was held that, where one has been notified of a design to steal his goods, which he neither ratified nor suggested, he may, in order to deteet the thief; direct an agent to encourage the design and afford facilities for the completion of the crime; and such facilities will not affect the criminality of the thief.
 

 Again, in the case of State v. Dudoussat, 47 La. Ann. 977, 17 So. 685, 687, the court held that “it is legitimate to adopt such measures as may be deemed necessary to detect crime, provided the means used do not amount to a practical -inducement or solicitation to commit it.”
 

 “Mere knowledge that a person’s property is to be burglarized followed by no action on his part to thwart the plan, is not deemed a con
 
 *718
 
 sent to it; and mere passiveness for the purpose of securing evidence of the burglary is not such consent as to excuse the defendant.” 4 R. C. L. 423.'
 

 See “Use of Decoys,” 9 R. C. L. 1298.
 

 See “Entrapments—Acquiescence for Detection,” 25 Cyc. 43.
 

 See “Larceny—Co-operation of Agent or Owner,” 36 C. J. 760, § 96.
 

 In 18 A. L. R., beginning at page 146, will be found an elaborate ease note under the heading “Entrapment to commit crime with view to prosecution therefor.”
 

 In this general note, under the subhead “Larceny,” at page 172, of 18 A. L. R., the general rule is stated as follows:
 

 “It is well established that where the criminal design originates with the accused, and the owner does not,' in person or by an agent or servant, suggest the design or actively urge the accused on to the commission of the crime, the mere fact that the owner, suspecting that the accused intends to steal his property, in person or through a servant or agent, exposes the property, or neglects to protect it, or furnishes facilities for the execution of the criminal design, under the expectation that the accused will take the property, or avail himself of the facilities furnished, will not amount to a consent in law, even though the agent or servant of the owner, by his instructions, appears to co-operate in the execution of the crime; and the defense of entrapment is inapplicable.”
 

 There is no error disclosed by this bill.
 

 2. The witness Bacon was asked if he recovered all the goods stolen, and answered that he did not. He was then asked how much he failed to recover. This testimony was objected to on the ground that it was irrelevant. ' It was admitted and defendant excepted. In his per curiam, the district judge said:
 

 “The question was relevant under the testimony already introduced as to the exact quantity and description of goods taken, only part of which had been produced at the trial. However, the evidence was harmless in any event.”
 

 It seems that this testimony was offered in connection with that given by another witness, who said that defendant had destroyed and given away part of the goods delivered to him. It would seem that the testimony was relevant for the purpose offered. The district judge, who had heard all the witnesses, thought so. If he erred in admitting it, his error was unimportant and harmless. No injury has been pointed out as a result of the introduction of this testimony.
 

 3. B. B. Powell, a deputy sheriff from De Soto parish, where the larceny was committed, was asked if he had Mike Natalie, who was accused of the theft,-in jail at Mansfield.
 

 Defendant objected to the testimony for the reason that “the same was immaterial and irrelevant.”
 

 The testimony was admissible for the purpose offered. Counsel for defendant had sought to show that the state was discriminating against the defendant in that it was seeking to punish him, but was not attempting to prosecute Mike Natalie, who was accused of the theft. The testimony was offered for the purpose of showing that the state had not abandoned the case against Mike Natalie, but was holding him in jail on the charge.
 

 4. Bill No. 4 has been abandoned.
 

 5. Mr. Gain, the sheriff, was asked if the proposition to steal the goods was made to him or to some one else. The testimony was objected to as hearsay.
 

 The trial judge correctly disposed of this objection in his per curiam as follows:
 

 “It was necessary to show that the goods received by the defendant had been stolen.
 
 *720
 
 Counsel contended that agreements between the officers, the owner of the goods and the witness Shepherd, .proved the goods not to have been stolen. Conversations between these persons as to the agreement were the only means of establishing the facts as to this issue. They were not hearsay, but constituted direct and primary evidence of the agreement. Moreover, this evidence was sought by the defendant himself as a major part of his defense.”
 

 His ruling is approved.
 

 6. Bill No. 6 was reserved to. the ruling of the court in permitting the sheriff to testify that, in setting the trap to catch the criminals, he acted upon the advice of the district attorney. The objection was that the testimony was “immaterial and irrelevant.”
 

 It is difficult to understand what bearing this testimony had on the case. The sheriff was within his rights in setting a trap to catch the criminal, and whether he acted upon his own initiative or on the advice of the district attorney makes no difference. The testimony was immaterial and irrelevant, but, as the defendant suffered no injury or prejudice from its admission, he has no right to complain.
 

 7. Bill No, 7 presents the same question as bill No. 5 and the same ruling applies.
 

 8. Bill No. 8 was reserved to the ruling of the court In permitting the witness Williams to state what Mike Natalie told him about the taking of the goods.
 

 The testimony was objected to on the ground that it was “immaterial, irrelevant and hearsay.”
 

 The testimony was not amenable to any of these objections. The state, in order to make out its ease against the defendant for receiving stolen property, had to show that the property was stole'n. The defense was that the property was not stolen because Mike Natalie, the Alleged thief, did not originate the criminal design, but, on the contrary, that the scheme and design wére concocted by the prosecuting witness. From the brief of counsel for defendant (p. 81,,Bill No. 15) we learn that Mike Natalie had testified that “the detective instigated the crime.”
 

 This testimony was offered to impeach Mike Natalie, to show that he had made a statement to the witness that he himself was the instigator of the crime and had carried it through. The testimony was admissible for that purpose.
 

 9. Bill No. 9 was reserved to the ruling of the court in refusing to discharge the jury on account of statements made by the assistant district attorney in his opening argument before the jury. The bill recites that the assistant district attorney “stated to the jury what was, in his opinion, the reason for defendant not taking the stand to testify in his own behalf.”
 

 The exact language used by the state’s attorney is not in the record. He stated emphatically in his brief that he did not comment upon or mention the fact that the accused did not take the stand. It seems that, some time prior to the trial, the accused visited the district attorney and talked with him in his office about the case, and it was thought that he did not tell all he knew. The assistant district attorney says he used the following language before the jury, with reference to that interview:
 

 “Why did he (referring to the accused) not tell the officers the whole truth? Why did he have to use the ruse that he would have to see Mike? Because he was afraid of the Marsalise family.”
 

 The trial judge did not understand, according to his per curiam, that the prosecutor commented on or mentioned the fact that accused
 
 *722
 
 failed to take the stand. According to the record before us, the trial judge did not err in refusing to discharge the jury.
 

 10. Bill No. 10 was reserved to the following portion of the court’s general charge:
 

 “Stolen, as used in the charge, means taking feloniously, with intent to deprive the owner of the ownership, and to convert the goods to the taker’s use without the consent of the owner. Consent of the owner, in this connection, means, that he agrees that the person taking the goods shall take them; that he shall use, dispose of, or destroy them as he please, as though he owned them, and that the true ownership permits loss of the goods, without recompense for their value.”
 

 Counsel object to the court’s explanation of the word “Consent.” What counsel wanted the court to charge was that, if the owner of the goods agreed with the officers to set a trap to catch the thieves, he, in law, consented to the taking. We disposed of this question under Bill No. 1.
 

 11. Bills 11 to 16 were reserved to the. court’s refusal to give certain special charges. The points referred to in these special charges, except one or two, had been fully covered in the court’s general charge, and related to the question of the owner’s consent to the taking of his goods.
 

 16. Bill No. 16 was reserved to the court’s refusal to give the following charge:
 

 “Where one is induced by the officers to commit a crime, where the officers frame up to get him to violate the law, the victim should not be found guilty.”
 

 There is no testimony that the officers or any one else “framed up” to induce any one to violate the law. This charge was properly refused.
 

 17. Bill No. 17 was retained to the ruling of the court in refusing to grant a new trial, “on the ground that the verdict of the jury was contrary to the law and the evidence.” This refers to the evidence attached to the bills. The bill recites: “Which evidence shows that the goods which defendant is charged with having received' as stolen goods, were taken from the store building of the prosecuting witness with his’consent.”
 

 The verdict so far as this evidence is concerned is correct, as we have already held.
 

 The verdict and sentence are affirmed.